IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

TERESA KEARNS,                )
                              )
          Plaintiff,          )
                              )
                              )   CIV-14-394-M
v.                            )
                              )
CAROLYN W. COLVIN,            )
  Acting Commissioner of Social )
  Security Administration,    )
                              )
          Defendant.          )

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(I), 423. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be affirmed.

I. Administrative History and Medical Evidence

Plaintiff applied for benefits on August 2, 2010 (protective filing date), and alleged she became disabled on November 14, 2007, due to post-traumatic stress disorder ("PTSD"), bipolar disorder, anxiety/depression, and panic attacks. (TR 128, 165). The disability onset date was later amended to August 2, 2010. (TR 40). Plaintiff stated she stopped working on

1

November 14, 2007, at the age of 36, because she was "homeless and ... living in my car." (TR 165). Plaintiff has a twelfth grade education and previous work as a co-manager of a group home, group home aide, and home health worker. (TR 166). Plaintiff's insured status for the purpose of Title II disability insurance benefits expired on June 30, 2012. (TR 161).

There is no record of medical treatment for Plaintiff prior to May 7, 2010. On that date, Plaintiff sought treatment at the Wewoka Indian Health Clinic for hand pain that she attributed to "pulling weeds 2 days ago," left knee pain "from being kicked with a steel toed boot about 1 month ago," and right ankle pain with a history of fracture and surgery with plates and screws in 2001. (TR 340-341). The examiner noted Plaintiff had recently moved to Oklahoma from Oregon and that Plaintiff reported she was taking several medications for asthma, depression with anxiety, and pain. Her medications were refilled, and ten days later Plaintiff was prescribed narcotic pain medication at the clinic for right ankle pain. (TR 333-335).

Plaintiff was also treated at the Creek Nation Community Hospital in May 2010 for mood disorder and chronic pain syndrome. She was prescribed anti-depressant, anti-inflammatory, and allergy medications. (TR 289-290).

Plaintiff was treated at the Creek Nation Community Indian Health Clinic in July 2010, where she sought medications for anxiety and right ankle pain. (TR 288). She was prescribed anti-inflammatory, anti-depressant, and allergy medications.

In July 2010, Plaintiff was treated at the Seminole Nation of Oklahoma Social Services Department, where she was diagnosed with PTSD with a history of domestic

2

violence, bipolar disorder, severe anxiety and depression, and panic attacks. (TR 298). An unknown physician (the physician's signature is illegible) stated on a form completed at that time that Plaintiff was not employable for three months. She was prescribed anti-depressant and anti-anxiety medications and advised to enter group therapy.

Plaintiff continued treatment at Wewoka Indian Health Services in June, July, August, and September 2010, for bipolar disorder, anxiety, right ankle pain, and high blood pressure. (TR 302-327). She advised an examining clinician in August 2010 that she had low back and neck pain resulting from her "boyfriend lift[ing] her up and drop[ping] her on her head" five days before. (TR 309).

An unidentified physician at Seminole Nation of Oklahoma Social Services Department completed a form dated November 5, 2012 ("Janssen, M.D." is printed on the form beside the illegible signature), that Plaintiff was not employable for 3 months due to PTSD, bipolar disorder, and severe anxiety/depression with panic attacks. (TR 348).

In a consultative psychiatric evaluation conducted by Dr. Al-Botros on January 31, 2011, Plaintiff reported a previous history of diagnoses of bipolar disorder, PTSD due to an abusive relationship, and methamphetamine abuse. Plaintiff reported a multitude of symptoms but denied suicidal ideation. She reported she was sometimes non-compliant with her bipolar medication and that she had a history of panic attacks lasting for varying amounts of time. Plaintiff stated she was taking anti-depressant, anti-anxiety, pain, and muscle relaxant medications.

Dr. AL-Botros conducted a mental status examination and noted normal findings. (TR

3

352-353). The diagnostic impression was bipolar disorder I, panic disorder without agoraphobia, and PTSD from physical abuse, with a GAF[1] assessment of 75-80. (TR 353).

In February 2011, an unidentified physician at Seminole Nation Social Services Department completed a form indicating Plaintiff was diagnosed with PTSD, bipolar disorder, and severe anxiety/depression, that she was prescribed anti-depressant, anti-anxiety, and mood-stabilizing medication, that she was advised to enter group therapy for PTSD/anxiety, and that she was "unlikely" to be employable for an "[i]ndefinite" length of time. (TR 354).

Plaintiff underwent successful surgery in March 2011 performed by Dr. Levings to remove the hardware in her right ankle. (TR 377-390). Dr. Chesler authored a letter dated April 14, 2011, addressed "To Whom It May Concern" in which the physician stated that Plaintiff was a patient at the Wewoka Indian Health Services, that she was diagnosed with Bipolar Disorder type II and PTSD and that she had pending assault charges filed against her in October 2010. (TR 427). Dr. Chesler stated that as a possible "explanation for her behavior" in October 2010 Plaintiff had PTSD as a result of previous abuse that could result in "flashback[s] to situations in the past where they [sic] have been under threat." (TR 427).

---

[1]The diagnosis of mental impairments "requires a multiaxial evaluation" in which Axis I "refers to the individual's primary clinical disorders that will be the foci of treatment," Axis II "refers to personality or developmental disorders," Axis III "refers to general medical conditions," Axis IV "refers to psychosocial and environmental problems," and Axis V "refers to the clinician's assessment of an individual's level of functioning, often by using a Global Assessment of Functioning (GAF), which does not include physical limitations." Schwarz v. Barnhart, No. 02-6158, 2003 WL 21662103, at *3 fn. 1 (10th Cir. July 16, 2003)(unpublished op.)(citing the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM IV)(4th ed. 1994), pp. 25-32).

In January 2011, Plaintiff reported to a therapist at the Wewoka Indian Health Clinic that she would be entering an alternative treatment program as part of a plea bargain. (TR 438). In February 2011, her therapist at the Wewoka Indian Health Clinic noted that Plaintiff had a pending court date and was living in an apartment. (TR 437). In May 2011, the therapist noted that Plaintiff had not attended therapy since February 2011. (TR 431).

In May 2011, Plaintiff sought treatment at the Wewoka Indian Health Clinic, where she was found to have fractured a finger on her right hand. (TR 444). Plaintiff was also diagnosed in May 2011 with hepatitis C viral infection. (TR 448).

Apparently as part of a court order in relation to her felony charges, Plaintiff established treatment in April 2011 with Mental Health Services of Southern Oklahoma ("MHSSO"). (TR 484). She reported a history of physical abuse and sexual abuse, and she was taking anti-depressant, anti-anxiety, and mood-stabilizing medications. Plaintiff also reported that she had a history of methamphetamine use. She stated she last used methamphetamine in February 2011 and had previously used methamphetamine in January 2011, October 2010, and January 2010. (TR 485, 486). She stated she had been charged with assault and battery in October 2010. (TR 486). Plaintiff reported her boyfriend was providing financial support, and she refused substance abuse treatment. (TR 490).

In May 2011, a primary clinician at MHSSO noted Plaintiff was diagnosed with PTSD, Bipolar disorder type I, and borderline personality disorder (TR 497). She was prescribed anti-depressant and mood-stabilizing medications. (TR 495). She reported a month later that she had not taken one of the prescribed medications and she was "doing

5

okay." (TR 492).

In September 2011, an additional medication was prescribed at MHSSO for Plaintiff's report of "nightmares." (TR 517). In October 2011, a new treatment plan was prepared for Plaintiff at MHSSO in which the clinician stated Plaintiff was participating in mental health court and staying with her parents. She was able to do self care, and she reported her medications were effective in decreasing her depressive and anxiety symptoms. (TR 503-505). She was also consistent in attending group therapy, she was making progress socially, and her coping skills were improving. She was prescribed medication to help with bladder and bowel control. (TR 511). A current GAF assessment of 52 was noted on the treatment plan. (TR 503). She reported she had 58 sober days at that time. (TR 504).

In April 2012, Plaintiff was admitted for inpatient treatment at the Carl Albert Community Mental Health Center after she reportedly took 10 anti-anxiety pills and 10 muscle relaxant pills because she wanted to sleep during the daytime, but then called 911. (TR 523). She was transferred to the inpatient unit on an emergency detention order. Plaintiff reported she had been released from jail on April 9, 2012, after being detained for 30 days on a drug court violation. (TR 528). She reported a criminal history, including assault and battery on a police officer and possession of methamphetamine, and intermittent methamphetamine use, but none in the past 40 days. (TR 529). Dr. Bowden conducted a mental status examination of Plaintiff, which was reportedly normal, and gave a diagnostic impression of depressive disorder not otherwise specified, PTSD, amphetamine dependence in early remission, and borderline personality disorder. (TR 530). .

Plaintiff was discharged from treatment on May 11, 2012. In a discharge note, a treating clinician, Ms. Baugh, noted that Plaintiff reported she was doing well and denied suicidal thoughts. Plaintiff was noted to be compliant with medications, sleeping well, and to have participated well in groups. (TR 532).

On June 5, 2012, Plaintiff was admitted for inpatient mental health treatment at Griffin Memorial Hospital after she reportedly again overdosed on her anti-anxiety and muscle relaxant medications and expressed suicidal thoughts. (TR 544). She reported she was homeless, she had not been taking her medications as prescribed, and she reported a long history of schizophrenia and bipolar disorder. (TR 552, 556).

Plaintiff also admitted that she had a history of using a variety of illegal substances, including "smoking opiates" at age 39 (or approximately one year prior to her admission) and a previous charge in 2010 for possession of a controlled substance. (TR 551, 553). Plaintiff reported she was a drug court participant, that she had been detained in jail in January 2012 after positive urinalysis testing while on drug court probation, and that she had been jailed again in March 2012 for a drug court violation. (TR 553).

A clinician noted that Plaintiff provided inconsistent information concerning her drug usage, informing one clinician she had not used any drugs for six years but admitting to another clinician that she last used methamphetamine 90 days prior to admission (which would have approximately occurred March 2012). (TR 551, 557).

Plaintiff was stabilized on medications and discharged to a shelter on July 24, 2012. (TR 546-547). Dr. Noor, her treating psychiatrist during this hospitalization, noted final

diagnoses of schizoaffective disorder, depressed type, polysubstance dependence, borderline personality disorder, and type II diabetes, and a GAF assessment of 52 at the time of discharge. (TR 547).

In a hearing conducted before Administrative Law Judge Parrish ("ALJ") on September 6, 2012, Plaintiff testified that she was 40 years old and she had been sober for six months. (TR 42). Plaintiff testified she was compliant with her medications and that her medications did not cause drowsiness, but she was not able to work because of paranoia and feeling overwhelmed. Plaintiff stated she was hardly ever suicidal, she was regularly attending meetings and thought her substance abuse was under control. Plaintiff testified she weighed 275 pounds, and she had difficulty with urinary incontinence occurring two to three times per day, which required her to wear pads. A vocational expert ("VE") also testified at the hearing.

II. ALJ's Decision

In a decision dated September 24, 2012, the ALJ found that Plaintiff had not worked during the period from her amended alleged onset date of August 2, 2010¹, through the date she was last insured for Title II benefits, June 30, 2012. (TR 20). Following the agency's well-established sequential evaluation procedure, the ALJ determined at step two that Plaintiff had severe impairments of status post ankle fracture, obesity, bipolar I disorder, PTSD, and borderline personality disorder. (TR 20). The ALJ found these impairments were not *per se* disabling at the third step.

At step four, the ALJ found Plaintiff had the residual functional capacity ("RFC") to

8

perform a limited range of light work. (TR 23). The ALJ found Plaintiff could occasionally stoop, kneel, or crouch, she was able to interact appropriately on a superficial basis with coworkers and supervisors but she could not interact with the general public, she could understand, remember, and follow simple, routine instructions and she had the concentration capability necessary to perform unskilled work with specific vocational profile level of two. (TR 23). In discussing the evidence supporting the RFC finding, the ALJ noted that Plaintiff's "mental health impairments have been complicated by drug and alcohol abuse, primarily consisting of repeated methamphetamine abuse." (TR 23).

The ALJ found that Plaintiff was not capable of performing her past relevant work. Reaching the fifth and final step, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. Relying on the VE's hearing testimony, the ALJ found that in light of Plaintiff's RFC for work and vocational characteristics (age, education, and work experience), she could perform jobs available in the economy, including the jobs of night cleaner, packing line worker, and small products assembler.

The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. § 404.981; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

III. General Legal Standards Guiding Judicial Review

The Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758,

760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

The Social Security Act authorizes payment of benefits to an individual with disabilities. 42 U.S.C. § 401 *et seq*. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord, 42 U.S.C. § 1382c(a)(3)(A); see 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than twelve months. Barnhart v. Walton, 535 U.S. 212 (2002).

Plaintiff's insured status for the purpose of Title II disability insurance benefits expired on June 30, 2012. Consequently, to be entitled to receive disability insurance benefits, Plaintiff must show that he was "actually disabled [within the meaning of the Social Security Act] prior to the expiration of his insured status" on . Potter v. Secretary of Health & Human Servs., 905 F.2d 1346, 1349 (10th Cir. 1990)(*per curiam*); accord, Adams v. Chater, 93 F.2d 712, 714 (10th Cir. 1996); Henrie v. United States Dep't of Health & Human

Servs., 13 F.3d 359, 360 (10th Cir. 1993).

IV. Alleged Errors in Evaluation of the Evidence

Plaintiff presents several arguments pointing to alleged errors in the ALJ's evaluation of the evidence. First, Plaintiff asserts that the RFC determination is not sufficiently specific because it refers to "[n]onspecific qualifying terms (e.g. superficially) [that] are not sufficient since the language does usefully convey [sic] the extent of the claimant's maximum capabilities." Plaintiff's Opening Brief, at 4-5. Plaintiff refers to Social Security Ruling 96-8p, but provides no authority for the assertion that the ALJ's RFC determination was not sufficiently specific.

In assessing Plaintiff's RFC, the ALJ gave significant weight to the agency medical consultants' mental RFC opinions. (TR 27). Joan Holloway, Ph.D., opined on March 14, 2011, that Plaintiff could "perform simple tasks with routine supervision," could "relate to supervisors and peers on a superficial work basis," could not relate to the general public, but could "adapt to a work situation." (TR 371). This opinion was affirmed as written by Sharon Taber, Ph.D., on July 21, 2011. (TR 500).

An ALJ's largely identical RFC finding of the ability to interact only superficially and incidentally with coworkers and supervisors, based on a medical consultant's mental RFC opinion, was upheld without discussion by the Tenth Circuit Court of Appeals in two unpublished decisions, Bales v. Colvin, 576 Fed. App'x. 792, 797-98 (10th Cir. 2014)(unpublished op.), and Lull v. Colvin, 535 Fed. App'x. 683, 686 (10th Cir. 2013)(unpublished op.). Plaintiff's argument is without merit.

11

Next, Plaintiff asserts that the ALJ failed to include a limitation in the RFC addressing Plaintiff's testimony that she suffered daily urinary incontinence requiring her to wear pads. Plaintiff points out that she also testified she had to "change clothes and bathe when she had these events." Plaintiff's Opening Brief, at 5. Plaintiff actually testified that "[a] lot of times" she had to change clothes and bathe. (TR 53-54). The ALJ recognized in the decision that Plaintiff testified she wore pads due to urinary incontinence occurring two to three times per day. (TR 26). Plaintiff does not point to any medical evidence reflecting Plaintiff sought treatment for urinary incontinence, and Plaintiff testified she was not receiving medical treatment or taking any medications for urinary incontinence. Thus, there was no probative evidence in the record that the ALJ should have considered in the decision. Plaintiff's testimony alone cannot establish the existence of a disabling nonexertional impairment. See Musgrave v. Sullivan, 966 F.2d 1371, 1376 (10th Cir. 1992). No error occurred in this respect.

Plaintiff next argues that the ALJ erred by failing to expressly consider the GAF assessment of 30 appearing in the record at the time of Plaintiff's admission to Griffin Memorial Hospital in June 2012. The record reflects that in a discharge summary dated August 3, 2012, Dr. Noor, Plaintiff's treating psychiatrist during this hospitalization, did indeed note that upon admission Plaintiff was diagnosed with mood disorder not otherwise specified and a GAF assessment of 30. (TR 544). However, Plaintiff admitted that at the time of her admission she was non-compliant with her prescribed medications for her mental impairments. At the time of her discharge, Dr. Noor noted a GAF assessment of 52,

12

indicating only moderate symptoms.

The ALJ summarized in the decision the record of Plaintiff's hospitalization in Griffin Memorial Hospital. The ALJ recognized, consistent with the evidence of record, that Plaintiff related she had stopped smoking methamphetamine three months before her admission and that she was not compliant with her psychotropic medications prior to her admission. The ALJ further recognized, consistent with the evidence in the record, that Plaintiff was stabilized on medications during her treatment and was discharged in stable condition on July 24, 2012, with a plan for ongoing outpatient mental health treatment following discharge. (TR 25).

The ALJ's decision reflects consideration of the probative evidence with respect to Plaintiff's hospitalization in June and July 2012, only a year after the medical consultants issued their opinions.[2] The ALJ did not err in failing to specifically address the one-time low GAF score in light of Plaintiff's admission of medication non-compliance and her subsequent positive response to medications. See Lee v. Barnhart, 117 Fed. App'x. 674,678 (10th Cir. 2004)(unpublished op.)("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work.").

---

[2]The cases cited by Plaintiff in support of her argument involved substantially different factual circumstances and are therefore not pertinent to this case. One of these cases, Stephens v. Apfel, 134 F.3d 383 (Table), 1998 WL 42524 (10th Cir. 1998)(unpublished op.) involved a four-year gap between a consultative examiner's report and a more-recent treating psychiatrist's report. The other, Wier ex rel. Wier v. Heckler, 734 F.2d 955 (3rd Cir. 1984), a thirty-year-old Third Circuit Court of Appeals decision that is not binding on this Court, involved an adolescent and consultants' opinions rendered several years before the opinions of treating physicians concerning the adolescent's impairments.

Next, Plaintiff asserts that the ALJ erred in affording significant weight to the opinions of the agency medical consultants because those opinions pre-dated her mental health hospitalizations in 2012. "It is the ALJ's duty to give consideration to all the medical opinions in the record. He must also discuss the weight he assigns to such opinions," including the opinions of state agency medical consultants. Keyes-Zachary v. Astrue, 695 F.3d 1156, 1161 (10th Cir. 2012).

As explained in a recent, unpublished opinion issued by the Tenth Circuit Court of Appeals, "[t]he governing and unchallenged regulation states that the weight an ALJ may give to the opinions of nonexamining sources 'depend[s] on the degree to which they provide supporting explanations for their opinions,' and that an ALJ should 'evaluate the degree to which these opinions consider all of the pertinent evidence in [a] claim, including opinions of treating and other examining sources.'" Tarpley v. Colvin, __ Fed. App'x. __, 2015 WL 451237, *2 (10th Cir. 2015)(unpublished op.)(citing 20 CFR 416.927(c)(3)).

The ALJ in this case found that Dr. Holloway's and Dr. Taber's opinions as to Plaintiff's mental RFC for work were entitled to significant weight because they were "consistent with the mental status findings upon examination, treating medical records, objective medical evidence, and overall record." (TR 27). No doctor has stated that Plaintiff is disabled by her mental and/or physical impairments.

As the ALJ recognized, nothing in the Plaintiff's subsequent records after the dates of the medical consultants' opinions was inconsistent with the opinions rendered by the medical consultants. In both of Plaintiff's hospitalizations after the medical consultants

rendered their opinions, she became stable on medications. The consultants rendered their opinions after Plaintiff's consultative psychiatric evaluation by Dr. Al-Botros, and the consultants explained the basis of their opinions based on medical evidence in the record. No error occurred in the ALJ's evaluation of the opinions of the agency medical consultants.

V. Credibility

Plaintiff asserts that there is not substantial evidence to support the ALJ's credibility determination. Plaintiff specifically argues that the ALJ did not properly link specific evidence to recognized factors relevant to the credibility finding. Plaintiff also suggests that the ALJ "pre-determined" Plaintiff's RFC for work before considering Plaintiff's credibility.

"Credibility determinations are peculiarly within the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence." Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990). In determining a claimant's credibility, an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at * 4 (1996). Credibility findings must "be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002)(quotations and alteration omitted).

In addition to objective evidence, the ALJ should consider certain factors in evaluating a claimant's credibility, including the claimant's daily activities; the location, duration, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication

15

the individual takes or has taken to alleviate pain or other symptoms; any treatment other than medications the individual receives or has received for pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p, 1996 WL 374186, at * 3. See Hamlin v. Barnhart, 365 F.3d 1208, 1220 (10th Cir. 2004)(stating ALJs "should consider" factors set forth in SSR 96-7p). An ALJ is not, however, required to conduct a "formalistic factor-by-factor recitation of the evidence." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). Employing "common sense" as a guide, the ALJ's decision is sufficient if it "sets forth the specific evidence he [or she] relies on in evaluating the claimant's credibility." Id.; Keyes-Zachary v. Astrue, 695 F.3d 1156, 1167 (10th Cir. 2012).

In the ALJ's decision, the ALJ summarized Plaintiff's testimony at the hearing and concluded that her complaints of disabling limitations due to her mental impairments were only partially credible. The ALJ pointed to Plaintiff's own statements and her father's statements concerning her usual daily activities and concluded that these statements were not consistent with her allegation of disabling impairments. (TR 26). The ALJ also pointed to Plaintiff's "unpersuasive appearance and demeanor while testifying at the hearing," but pointed out this observation was only one factor considered in determining Plaintiff's credibility. (TR 27).

Although the ALJ did not specifically cite any of Plaintiff's treatment records in connection with the credibility determination, the decision includes a summary of the

16

relevant medical evidence, and the ALJ appropriately notes that these records indicate Plaintiff's symptoms diminished when she was compliant with medications. For instance, the ALJ noted that Dr. Al-Botros estimated Plaintiff's GAF score to be 75 to 80, "signifying a person who has symptoms and problems, but they are temporary, expectable reactions to stressors with no more than slight impairment in any area of psychological functioning (Exhibit 9F)." (TR 24). The ALJ noted that at the time of her discharge from Griffin Memorial Hospital she had "stabilized and improved" with medications." (TR 25). Further, the ALJ noted that Plaintiff was "able to attend group counseling and twelve-step support groups." (TR 26).

The ALJ also considered the opinions of the agency's medical consultants, the checklist forms completed by unidentified sources at the Seminole Nation of Oklahoma Social Services Department, the letter Dr. Chesler authored in April 2011 apparently in connection with Plaintiff's pending felony charges, and her father's third party report of her functional abilities. (TR 27-28).

The ALJ provided reasons that are well supported by the record for giving significant weight to the agency medical consultants' opinions. The ALJ provided reasons that are well supported by the record for giving minimal weight to the opinions set forth on the checklist forms completed for the Seminole Nation of Oklahoma Social Services Department.

Plaintiff's argument that the ALJ "pre-determined" her RFC for work before addressing her credibility has been rejected where, as here, there was no indication that the ALJ did not factor in Plaintiff's credibility in making the RFC determination. See Jimison

17

ex rel. Sims v. Colvin, 513 Fed. App'x. 789, 796 (10th Cir. 2013)(unpublished op.).

The credibility determination is well supported by the record. It was proper for the ALJ to consider inconsistencies between Plaintiff's hearing testimony and the information in the medical records. The record reflected Plaintiff continued to abuse illegal substances after she alleged she became disabled, a factor that detracted from her credibility. The record also reflected that when she was compliant with medications Plaintiff's mental symptoms decreased to moderate levels that would allow her to perform a limited range of work with adequate restrictions, as set forth in Dr. Holloway's and Dr. Taber's mental RFC assessments, to appropriately accommodate her mental and physical impairments. Because there is substantial evidence in the record to support the Commissioner's decision, the decision should be affirmed.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before _____ April 7th ___, 2015, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation

are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this   18th   day of   March  , 2015.

*/s/ Gary M. Purcell*
GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE